IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────────────────────

GLENN L. DIXON,

                        Plaintiff,                        OPINION & ORDER

    v.

                                                                   12-cv-611-wmc

TIMOTHY CASIANA et al.,

                        Defendants.
───────────────────────────────────────────────────────────────────────

In this civil action, *pro se* plaintiff Glenn Dixon alleges that defendants Michael Rataczak, Jason Caudillo, Tracy Kopfhamer and Kevin Pitzen, all employees of the Department of Corrections ("DOC") at Columbia Correctional Institution ("CCI"), used excessive force against him during his incarceration in violation of his Eighth Amendment rights. He also alleges that defendant Timothy Casiana is liable for failing to supervise and intervene in the use of excessive force. Defendants move for summary judgment on all of Dixon's claims. (Dkt. #38.) Because the court concludes that no reasonable jury could find in Dixon's favor on the undisputed facts of record, it will grant summary judgment in favor of all defendants.

UNDISPUTED FACTS[1]

Plaintiff Glenn Dixon was incarcerated at CCI at all times relevant to the allegations in his complaint. Defendant Timothy A. Casiana is employed by the DOC at CCI as a Supervising Officer II (also known as a Captain). Captain Casiana's duties include (1)

---

[1] Although Dixon has opposed the motion for summary judgment by filing a brief and a "statement of facts," he failed to adhere to this court's procedures by responding to each of defendants' proposed findings of fact. In addition, he presented no admissible evidence to establish a genuine dispute of fact. As such, the court finds the following facts to be material and essentially undisputed, except where otherwise noted in the Opinion section.

taking responsibility for the security, custody and control of inmates, (2) directing Supervising Officer I staff, and (3) supervising Correctional Officers and Sergeants. The remaining defendants are also employed by the DOC at CCI. At the time the events in Dixon's complaint took place, Caudillo was a Correctional Officer, and Kopfhamer, Pitzen and Rataczak were Officers. Their responsibilities included supporting unit staff, maintaining institution security, maintaining inmate safety and performing general tasks in housing units.

On September 8, 2011, Dixon was assigned to Housing Unit 5 at CCI. At about 7:38 P.M. that day, the Columbia Correctional Control Center signaled an alert-tone Team 1 call to that unit; a follow-up announcement indicated there was a fight occurring in the dayroom. Captain Casiana and a Captain Keller responded, as did Officers Risen, Caudillo, Rataczak and Kopfhamer. As ranking officers on the scene, Keller and Casiana took charge of the response; as a team #2 responder, Officer Pitzen stayed in the courtyard in case someone called for additional assistance.

Upon arriving at unit 5, Rataczak and Caudillo observed Dixon choking another inmate, Donte Beasley, by holding him in a headlock position in what appeared to be a choke hold. Officer Brown was directing other inmates to leave the dayroom while ordering Dixon to release Beasley. Caudillo observed Rataczak directing Dixon to release Beasley as well, but Dixon was not complying. Rataczak then pulled Dixon away from Beasley; as he did so, Dixon threw his arms back and actively resisted, disregarding Rataczak's orders. Rataczak then physically intervened for Beasley's safety, employing a technique called "decentralization" through which an inmate is directed to the nearest wall, floor or object to allow officers to get control.

As Rataczak forced Dixon to the ground, Caudillo came to assist in restraining him. Once on the ground, Dixon continued to resist by holding a table leg and refusing to roll over onto his stomach so that restraints could be applied. As Caudillo attempted to secure Dixon's left arm, he received a blow to the back of his head.

Casiana arrived on the scene and witnessed Risen and Brown stabilizing and placing Beasley in custody. Unlike Dixon, Beasley was not resisting. Casiana also witnessed Rataczak and Caudillo in a "semi-ground, stabilization position," a technique in which staff direct an inmate into a face-down position to prevent staff injury and enable staff to gain compliance. From what Casiana could see, the inmate was resisting Rataczak and Caudillo as they repeatedly told him to stop and to place his hands behind his back. Casiana personally saw Dixon grab the dayroom table leg in an attempt to pull away from or avoid the stabilization holds. Casiana then yelled, "Place your hands behind your back!" and "Stop resisting!" To which Dixon replied, "I'm not resisting." Nevertheless, Dixon continued to grasp the table leg and resist attempts to control his arms.

Casiana then moved into an intermediate stance, crouching with his knees bent; told Dixon to place his hands behind his back again; and applied pressure under Dixon's chin. At that time, Dixon released the table leg and began to comply with the officers' attempts to restrain him. Kopfhamer, who had arrived at the scene by this time, also assisted with the full-ground stabilization and the application of wrist and leg restraints. Because Dixon continued to actively resist staff, Sergeant Nelson then passed leg restraints out from the control room, which staff applied. Once in leg restraints, Dixon stopped resisting.

Having secured the scene, Casiana conferred with Keller and Rataczak, who indicated Dixon had been the aggressor. Keller escorted Beasley back to the Disciplinary

3

Segregation Unit 2, along with Risen and Brown, while Caudillo, Rataczak, Kopfhamer and Casiana helped Dixon to his feet and began to escort him to the Disciplinary Segregation Unit 1 ("DS-1"). DS-1 is the most secure and restrictive unit at CCI. There is no video of the escort between Housing Unit 5 and DS-1.

During escorts, inmates are instructed to face forward and not to look back ("target glance") at staff, so as to restrict their ability to determine the exact location of an escort officer in the event of a sudden assault attempt. Officers are trained to follow this practice, both to allow sufficient reaction time in the event of an assault and to maintain a position of advantage for physical control. In this formation, Rataczak served as the "trailing officer," following behind Caudillo and Kopfhamer, who served as the "hands-on" escort officers. Finally, Pitzen was in the courtyard observing the escort.

At the beginning of the escort, Dixon and the officers were traveling in a forward facing position. As the staff and Dixon entered Unit 5's courtyard, Dixon resorted to significant resistive tension in his body movement.[2] Kopfhamer felt Dixon actively tensing his arms. Dixon also repeatedly turned his head in the direction of escort officers, despite verbal warnings not to do so. Eventually, Casiana directed the officers not to give Dixon any additional warnings, based on his recent violent behavior. Pitzen also perceived Dixon to be highly agitated and heard staff repeatedly directing Dixon to face forward.

Partway through the escort, Dixon stopped moving forward and again attempted to turn back toward the escort staff. Pitzen stepped in to assist the escort team in securing Dixon and move him into a backward-facing escort position, used to maintain control of an

---

[2] In Dixon's brief, he denies having offered any resistance during the transport. While he offers no *evidence* that this is so, the court will discuss later in this opinion why the facts articulated in his brief, even if taken as true, do not alter its decision on summary judgment.

4

inmate when he is resisting forward movement. Rataczak then secured Dixon's head using a "Principals of Subject Control" technique ("POSC"), in which an officer is trained to place one hand under the inmate's chin to hold his mouth closed and the other on the inmate's forehead, bringing the back of the inmate's head into the officer's chest. The escorting officers then moved to "thread the needle," a term used to describe the application of compression holds to an inmate's wrists to secure his arms while the inmate is being turned to a backward-facing escort position.

While attempting both maneuvers, Caudillo briefly lost control of Dixon's arm. Pitzen then took control of Dixon's left arm, applying a compression hold to Dixon's wrist. During the struggle which ensued, Dixon briefly touched the ground. In that position, Dixon indicated he was having trouble breathing. Rataczk immediately adjusted his position and asked, "Are you okay now?" Dixon responded, "I'm all right."

After about three to five steps in the backward-facing position and an assurance of full compliance from Dixon, staff returned him to a forward-facing walking position, with escorts behind Dixon's shoulders and immediately behind him. Dixon did not resist during the remainder of the escort.

When Dixon arrived at DS-1, he was placed in the shower area and complied with a strip search. After declining a shower, Dixon requested to be seen by Health Services Unit ("HSU") staff. Because HSU staff were busy treating Beasley, Dixon was then placed in control status in cell #44 for actively resisting.

After HSU staff finished Beasley's treatment, Nurse Brehm arrived on DS-1 to evaluate Dixon. Staff placed Dixon in wrist and leg restraints and escorted him to the DS-1 dayroom, where Brehm cleaned and evaluated Dixon's injuries. His injuries appeared to

consist of two minor lacerations near Dixon's ankles. Brehm applied antibiotic cream and medically cleared Dixon to return to his cell.

Security personnel photographed the abrasions, as well as a mark on Dixon's forehead, which he attributes to the incident. Neither Dixon nor staff pointed to any additional injuries at that time.

Dixon was then escorted to DS-1 cell #21 and released from control status for his cooperation through the latter part of the incident. Brown did issue Dixon a conduct report for Battery and Disobeying Orders, for which he ultimately received a disposition of 180 days of disciplinary segregation.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. It is not sufficient to "simply

6

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.

Dixon's claims arise under the Eighth Amendment, which prohibits the unnecessary and wanton infliction of pain. When prison officials stand accused of using excessive force in violation of the Eighth Amendment, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). In conducting this inquiry, courts examine a variety of factors, including: (1) the need for an application of force; (2) the relationship between that need and the force applied; (3) the threat reasonably perceived by the responsible officers; (4) the efforts made to temper the severity of the force employed; and (5) the extent of the injury suffered by the prisoner. *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). In order to survive a motion for summary judgment, the prisoner must have evidence that supports a "reliable inference of wantonness in the infliction of pain." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

With respect to the incident in the unit 5 dayroom, there can be no dispute that defendants' use of force to subdue Dixon was appropriate. Dixon acknowledged engaging in a physical fight with another inmate -- a fight in which he had been the aggressor -- and that

7

he had the other inmate in a headlock.  Furthermore, the officers involved in subduing him have averred, and Dixon has not disputed, that Dixon refused to respond to verbal commands to release Beasley and that after they decentralized him, he continued to resist until they gained control of him by restraints.  Moreover, video confirms the altercation and corroborates the officers' account of the incident.  (*See* Timothy A. Casiana Decl. Ex. B (dkt. #40-2).)  Indeed, Dixon does not even appear to contest the reasonableness of the force officers applied in that instance.  (*See* Statement of the Facts (dkt. #51).)  Accordingly, no reasonable jury could find that Rataczak, Caudillo, Casiana and Kopfhamer applied excessive force in the unit 5 dayroom, and they are entitled to judgment on that claim.

With respect to the second incident, the court again begins with the undisputed facts that defendants were escorting Dixon to DS-1 after a violent physical altercation in which Dixon was the aggressor and during which he repeatedly resisted officers' attempts to place him in restraints.  Defendants also aver without contradiction that Dixon was agitated, tensed his arms and repeatedly turned his head toward officers despite warnings to cease that behavior.  It was only after Dixon apparently stopped moving altogether and tried to turn toward the officers again that they briefly applied force, turned him into a backward-facing position and proceeded that way for a few steps.  It is also undisputed that when Dixon indicated he was having trouble breathing, Rataczak immediately adjusted his position and confirmed that Dixon was all right.

Considered in the context of the *DeWalt* factors: (1) the officers reasonably perceived a threat to their safety when Dixon, who had just been involved in a violent fight, showed signs of resisting; (2) they applied only minimal force as they believed was necessary to ensure control of the situation; and (3) they attempted to temper the force applied.

8

Furthermore, while Dixon did sustain injuries in the form of abrasions to his ankles (*see* Casiana Decl. Ex. C (dkt. #40-3)), the only evidence in the record as to the nature of those injuries indicates they were minor and that Dixon was treated with an application of antibiotic cream before a nurse medically cleared him to return to his cell. (*See id.* Ex. A (dkt. #40-1) 2.)

While plaintiff represents that the abrasions to his ankle caused scarring and itching, he fails to offer proof that either is serious, much less severe enough to support a finding of excessive force in subduing him, as opposed to falling in the range of injuries experienced during the application of ankle restraints.[3] Moreover, the contemporaneous pictures of the plaintiff's ankles confirm only minor cuts. *See Outlaw v. Newkirk*, 259 F.3d 833, 839 (7th Cir. 2001) (no claim for excessive force where injuries were "superficial" and supported, at best, conclusion that defendant "deliberately and perhaps unnecessarily applied a relatively minor amount of force to achieve a legitimate security objective"). Finally, a jury could only speculate whether the injuries resulted from a struggle during the transfer, or whether they occurred during plaintiff's admitted resistance to placement of the cuffs during the fight in the dayroom.

All of these factors support defendants' contention that the use of force was minimal and further undermine Dixon's position that defendants used *excessive* force, since "a minor injury supports the conclusion that the incident was 'at most . . . a *de minimis* use of force not intended to cause pain or injury to the inmate.'" *Id.* at 840 (quoting *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (alteration in original)). Overall, the facts defendants

---

[3] Plaintiff's summary judgment brief also alludes to being so "mentally traumatized" by the incident that he "still take[s] medication for sleeping," but again, he offers *no* proof of any prescribed medication, much less that it was prescribed *because* of this incident.

9

propose, even when taken in the light most favorable to Dixon, simply do not state a claim for a violation of the Eighth Amendment. *See Guitron v. Paul*, 675 F.3d 1044, 1045-46 (7th Cir. 2012) (use of force in the course of prison security measures does not amount to cruel and unusual punishment even if it appears in retrospect that the amount of force applied was unreasonable).[4]

As noted above, Dixon has not produced any evidence of his own to combat defendants' evidence: he has not even provided his own sworn statement offering a competing account of the events of September 8, 2011. Nor has he followed this court's procedures by responding to defendants' proposed findings of fact. His opposition is essentially limited to argument in his brief. That fact alone justifies deeming defendants' proposed findings undisputed: the Seventh Circuit has held repeatedly that "[a]rgument is not evidence upon which to base a denial of summary judgment." *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 361 (7th Cir. 1992); *see also Outlaw*, 259 F.3d at 839 & n.2 (holding that inmate had presented no evidence contesting prison official's claim that he uttered

---

[4] Well after all summary judgment materials had been submitted, Dixon moved to supplement the record by introducing evidence of an appointment with an eye care specialist on April 8, 2014, and possible eye surgery scheduled for Tuesday, May 27, 2014. (*See* dkt. #56-1.) Notes from his appointment also indicate that he was "referred over for 'possible traumatic eye injury'" apparently caused by "a car accident 1 month ago," in which he hit his head, although there is also a reference to "2 yrs ago fingers 'pushed' into eyes." (*Id.* at 8.) The most fundamental problem with this late-submitted "evidence" is that Dixon did not timely raise alleged *eye* injuries in opposing defendants' motion for summary judgment. In reviewing his injuries, his opposition only claims injury to his ankles and mental trauma, making no reference to his eyes. (*See* Pl.'s Br. Opp'n (dkt. #49).) Even his complaint, though it refers to guards "plac[ing] their fingers into [his] eyes" and causing him pain and discomfort, does not allege any lasting physical injury to his eyes. (*See* Compl. (dkt. #1) ¶ 17.) While Dixon's actual appointment apparently did not take place until after his summary judgment materials were due, which might justify the late submission of the documentation itself, his failure even to *mention* an alleged eye injury in opposing summary judgment renders his attempt to supplement the record both untimely and prejudicial. Finally, these notes evince no more than an eye injury caused by a recent car accident, not an eye injury arising from the events described in this suit, particularly given that he apparently sought *no* eye treatment for two years. Thus, his motion to present additional evidentiary materials (dkt. #56) is denied as both untimely and futile.

hostile words, because "although Outlaw denies having said these words in his memorandum . . . none of his affidavits or supporting materials support his denial") (citing *Scherer*, 975 F.2d at 361).

Even crediting the "facts" Dixon alludes to in his opposition materials, he still has not produced sufficient evidence to withstand summary judgment. Essentially, Dixon's opposition takes issue with only one category of defendants' proposed facts: he argues that, contrary to defendants' assertions, he was *not* resisting or making "threatening gestures" during the escort following his violent altercation with another inmate. (*See* Pl.'s Br. Opp'n (dkt. #49).) Notably, Dixon does *not* argue at summary judgment that defendants' description of the force they actually employed is false or incomplete. Absent any evidence to the contrary, the court must credit defendants' description of their actions.

Even crediting the unsworn account of events in Dixon's opposition, the following narrative still emerges:

- After a fight with another inmate, in which Dixon was the aggressor and during which he resisted officers' attempts to subdue him, he was escorted from Unit 5 to DS-1. During that transport, he was wearing handcuffs and leg irons.

- While he did not resist defendants or make threatening gestures toward defendants, staff repeatedly instructed him, apparently unnecessarily, to face forward, consistent with protocol.

- Finally, they forced him into a backward-facing position, with Rataczak securing Dixon's head, again consistent with protocol, and other officers applying compression holds to his wrists.

- Dixon indicated to Rataczak that he could not breathe, and Rataczak immediately adjusted his position.

- Dixon was then required to walk three to five steps in the backward-facing position before staff returned him to a forward-facing walking position, escorting him without further incident to a segregation cell.

- Shortly thereafter, Dixon was seen for cuts to his ankles where ankle restraints had been forcibly applied.

Even viewing *these* facts in the light most favorable to Dixon, it remains true that no reasonable jury could conclude that defendants applied force "maliciously and sadistically for the very purpose of causing harm." *Outlaw*, 259 F.3d at 840. At best, under Dixon's version of events, defendants mistakenly believed Dixon to be non-compliant and resistant, or, at worst, they may have "deliberately and perhaps unnecessarily applied a relatively minor amount of force." *Id.* at 839. As the Seventh Circuit held in *Outlaw*, "[n]either scenario would involve a use of force that was 'repugnant to the conscience of mankind.'" *Id.* Thus, even if defendants' use of force was *unnecessary*, "the minor nature of the injury coupled with the absence of any other indicia of malice on [defendants'] part would force [the court] to conclude that it does not rise to the level of a constitutional violation." *Id.* at 840 (citing *Lunsford*, 17 F.3d at 1582). Accordingly, no reasonable jury could find for plaintiff on this record, and Rataczak, Caudillo, Kopfhamer and Pitzen are entitled to summary judgment.[5]

---

[5] Because Dixon's claim against Casiana is that he failed to intervene in the use of excessive force, and the court has found that plaintiff cannot prove defendants used excessive force, Casiana is likewise entitled to summary judgment. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an

12

Finally, many of Dixon's materials allege that he has been denied video footage of the transfer from Unit 5 to DS-1, which he argues would prove he was not resisting or threatening defendants. Defendants have indicated that there is "no retained video of the escort," though it is unclear when or why the video became unavailable. (*See* Defs.' PFOF (dkt. #39) ¶ 40.) Dixon has suggested in his brief opposing summary judgment that the denial of the video "should be noted as a cover-up." (Pl.'s Br. Opp'n Part 2 (dkt. #50).) There is no evidence of spoliation in the record, however. Nor is it clear that Dixon actually placed defendants on notice that the events in the courtyard gave rise to a possible Eighth Amendment claim, such that a duty to preserve the footage might arise. To the contrary, he did not bring this lawsuit until August of 2012, nearly a year after the events took place, and the record does not indicate Dixon filed a timely grievance that would have notified defendants of his potential claim.

In any event, the court has already addressed why, even were it to credit the version of events Dixon advanced at summary judgment, there is no genuine dispute of material fact. The court can imagine circumstances, however, in which the bad-faith failure to preserve video footage *might* entitle an inmate to the benefit of an inference adverse to defendants or even worse sanctions. While there is no evidence of such a failure here, defendants and the DOC should be careful to adhere strictly to their duty to preserve evidence, including video, that may prove relevant to an inmate's foreseeable claims.

---

underlying constitutional violation[.]") (citing *Fillmore v. Page,* 358 F.3d 496 (7th Cir. 2004)).

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #38) is GRANTED.

2) Plaintiff's motion for appointment of counsel (dkt. #55) is DENIED as moot.

3) Plaintiff's motion to file additional evidentiary materials (dkt. #56) is DENIED.

4) Defendants' motion to stay all pretrial deadlines and trial date (dkt. #59) is DENIED as moot.

5) The clerk of court is directed to enter judgment in defendants favor and close this case.

Entered this 7th day of August, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge